***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and oral arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission AFFIRMS the Opinion and Award of Deputy Commissioner Stanback.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties before the Deputy Commissioner as:
 STIPULATIONS
1. The employee/employer relationship existed at the time of the injury.
2. Key Risk Insurance was the carrier on the risk at the time of the injury.
3. The date of injury was August 13, 1999, and plaintiff sustained an injury by accident arising out of and in the course of his employment on that date.
4. The parties were subject to the North Carolina Workers' Compensation Act at the time of the alleged injury; the employer, employing the requisite number of employees, to be bound under the provisions of the Act.
5. Plaintiff's average weekly wage was not stipulated to in the Pre-Trial Agreement; however, the parties agreed that the plaintiff is currently receiving disability compensation payments in the amount of $317.76 per week.
6. Documents stipulated into evidence include the following:
 a. Stipulated Exhibit #1 — Plaintiff's medical records
 b. Stipulated Exhibit #2 — Plaintiff's vocational rehabilitation records
c. Stipulated Exhibit #3 — Labor market survey
 d. Stipulated Exhibit #4 — Order by Executive Secretary Weaver
7. The issue to be determined is whether plaintiff failed to cooperate with vocational rehabilitation as required by the Industrial Commission's Order of October 1, 2002, such that his disability compensation should be suspended or terminated pursuant to N.C. Gen. Stat. §§ 97-25, 97-32, or other provisions of the Workers' Compensation Act, in effect on February 28, 2003, the date of the filing of the original Form 24.
 ***********
Based upon the most competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 31 years old and had completed the tenth grade.
2. Plaintiff sustained an injury by accident to his low back arising out of and in the course of his employment on August 13, 1999. He received disability compensation from defendants at the rate of $317.76, based upon an average weekly wage of $476.61, from the time of the injury through the date of the hearing before the Deputy Commissioner.
3. Plaintiff had reached maximum medical improvement, or the end of the healing period, by March 26, 2001, during his course of treatment with Dr. Angelo A. Tellis of Coastal Physical Medicine and Rehabilitation Services. Plaintiff had a ten percent (10%) permanent partial disability of the back at that time. Although Dr. Ronald A. Gioffre, a sports medicine specialist, of Greensboro Orthopaedic Center earlier believed that plaintiff would also have permanent partial disability of the left lower extremity due to a tibial plateau fracture at the time of his evaluation on April 14, 2000, Dr. Tellis later stated that there was no permanent disability for that condition.
4. Plaintiff underwent a functional capacity evaluation ("FCE") at Dr. Tellis' request at Kessler Rehab Management Systems on April 5, 2001; however, as set forth in the FCE report that was submitted as an exhibit to the Deputy Commissioner, the results of that evaluation were determined to be unreliable due to sub-maximal effort and inappropriate pain behaviors on the part of plaintiff.
5. During the course of his medical treatment, several physicians assigned work restrictions to plaintiff, including physicians at PrimeCare in 1999, Dr. Gioffre in 1999 and 2000, and Dr. Tellis in 2001 and 2002. Dr. Tellis' last noted restrictions on August 17, 2001, included no lifting greater than 20 pounds, no repetitive bending and twisting, allowing frequent changes of position and working eight hours per day maximum. On January 21, 2002, the restrictions were clarified to also include no climbing ladders, limiting driving to 30 miles, and limiting stairs to less than six steps.
6. Although the testimony taken before the Deputy Commissioner indicated that these work restrictions may not be totally reliable based upon plaintiff's performance on the FCE and also the exaggerated symptoms and pain behaviors exhibited during medical exams; nonetheless, these restrictions were followed by the vocational rehabilitation counselors who assisted plaintiff during the course of this claim.
7. Anthony Enoch was the first counselor to assist plaintiff with vocational rehabilitation. Mr. Enoch has a bachelor's degree in social work and a master's in administration with a concentration in community health. Mr. Enoch prepared an individualized written rehabilitation plan ("IWRP") in January 2001, which he forwarded to plaintiff's attorney at that time. Plaintiff was taking General Educational Development ("GED") courses as reflected in Mr. Enoch's report of June 12, 2001, and Mr. Enoch advised plaintiff to tell prospective employers that he was in the process of obtaining a GED High School Equivalency Diploma.
8. Competent and credible evidence presented at the hearing before the Deputy Commissioner supports that plaintiff hindered the vocational rehabilitation process during this early period of rehabilitation. For example, as reflected in vocational reports dated May 11, 2001, and August 15, 2001, as well as in an August 28, 2001, letter, plaintiff would overstate his restrictions and was reluctant to consider prospective jobs that he felt would not pay him enough money.
9. There were other instances of non-compliance by plaintiff while Mr. Enoch handled plaintiff's case. For instance, the plaintiff did not tell employers that he was enrolled in the GED program but would only say that he did not have a high school diploma; he told employers that he was applying for work because his vocational counselor "told him to"; he declined to take a basic reading test during an application process; and he did not complete job questionnaires. With respect to reading, plaintiff stated that he could not read at a high school level, despite tests that showed he could read at a post-high school level.
10. Further, there were also several instances when plaintiff's wife acted inappropriately during vocational meetings. Plaintiff wanted to tape record or videotape his meetings with Mr. Enoch, and plaintiff accused Mr. Enoch of being a "Key Risk employee" and of making false statements in his written reports. On one occasion, plaintiff threatened that he might go to Mr. Enoch's personal residence. During the course of these difficulties, the plaintiff's attorney had to discuss these problems with the plaintiff at Mr. Enoch's request.
11. The evidence further revealed that plaintiff's motivation to participate in vocational rehabilitation was low, his attitude toward the process was negative, and he was non-compliant. For example, in one instance a Wal-Mart greeter position was not offered because of comments that plaintiff made during the job interview. Plaintiff attended interviews but did not provide copies of an independent job search log as Mr. Enoch had requested. Plaintiff acted inappropriately during job interviews such as being loud and rude. Mr. Enoch was familiar with the labor market in the Jacksonville area and opined that plaintiff would have been employable had he put forth a reasonable effort to comply with vocational rehabilitation.
12. Plaintiff had a job interview at Telemarketing Concepts, which was not offered to him based on the results of the reading test administered during the application process. In contrast to plaintiff's self-professed lack of reading skills, the Wide Range Alternatives Test ("WRAT") administered to plaintiff reflects that plaintiff was at a post-high school level for reading.
13. On October 2, 2001, Executive Secretary Weaver filed an Administrative Order removing Mr. Enoch as the rehabilitation professional assigned to the case but ordered plaintiff to cooperate with the new counselor to be assigned. Beth Rasberry was the next counselor to assist plaintiff with vocational rehabilitation beginning in November 2001 after Mr. Enoch was removed from the case at plaintiff's request. Ms. Rasberry has a bachelor's degree in psychology and a master's in rehabilitation counseling and vocational evaluation. In addition, she is a certified rehabilitation counselor.
14. Ms. Rasberry also prepared an IWRP to include a job search. She acknowledged plaintiff's plan to attend school full-time at Coastal Carolina Community College beginning in January 2002. He expressed an intention to complete a two-year degree and then to transfer to a four-year program. This was not part of the IWRP but was something plaintiff chose to do on his own. Ms. Rasberry was of the opinion that plaintiff was employable without this additional schooling.
15. During his course of vocational rehabilitation with Ms. Rasberry, plaintiff gave reasons why certain jobs were not acceptable, stating, for example, that he could not stand and could not count money. Plaintiff told Ms. Rasberry that transportation was a barrier to employment, since his wife was his only means of getting to and from job interviews and work. Ms. Rasberry felt that Mr. Lane's class attendance was conflicting with the job search, but she advised him to work around his schedule as best as he could. Plaintiff complained at their meetings that the job search was interfering with his classes. At one time plaintiff told Ms. Rasberry that he could only meet with her at 6:00 a.m.
16. A review of the job search logs attached to Ms. Rasberry's reports and admitted into evidence, supports that plaintiff consistently delayed interviewing for prospective jobs after the date he was provided job lead information. Further, the records illustrate that plaintiff was not diligent in applying for jobs, with delays routinely exceeding a week from the date of the task assignment.
17. During the period of Ms. Rasberry's involvement with plaintiff's vocational rehabilitation, Ms. Rasberry indicated that plaintiff was non-compliant in other ways. For instance, plaintiff told her that he could not apply for jobs because the employers were not hiring; even though, Ms. Rasberry had confirmed that the employers were hiring before giving plaintiff the job search tasks.
18. When following up with employers, Ms. Rasberry would find that plaintiff's applications were not on file throughout the time she was providing vocational rehabilitation services. Plaintiff gave excuses for not applying for certain jobs, such as, a job was beyond his "driving restrictions" (the driving restriction was not to exceed 30 miles), when in fact the job was within 1.1 miles of the city limits of Jacksonville.
19. With respect to a potential Wal-Mart job, plaintiff told Ms. Rasberry that it was his "understanding" that he was not to apply for any position with Wal-Mart. Ms. Rasberry later spoke with this potential employer and learned that plaintiff had acted uninterested in employment, as if he had been forced to apply.
20. In her testimony at the hearing before the Deputy Commissioner, Ms. Rasberry opined that plaintiff was employable taking into account his qualifications, age, work experience and job restrictions. Overall, Ms. Rasberry assessed plaintiff as being non-compliant in vocational rehabilitation efforts. She described poor motivation and found plaintiff's attitude to be defensive and verbally belligerent. There were also other communication problems, and eventually, Ms. Rasberry requested that they only meet in the office of plaintiff's attorney. In the end, plaintiff never signed the IWRP that Ms. Rasberry had forwarded to him.
21. Kim Weisenberger was the next vocational counselor to assist plaintiff beginning in January 2003. In a February 28, 2003, report, Ms. Weisenberger recommended file closure due to plaintiff's continued refusal to sign the IWRP and due to feedback from employers that included complaints regarding plaintiff's attitude. Ms. Weisenberger also noted that plaintiff was unable to attend the training classes she had recommended due to conflicts with his course schedule at Coastal Carolina Community College. She did not feel that plaintiff was benefiting from vocational rehabilitation at that time.
22. Beginning in May 2003, Gregory Henderson was assigned to assist plaintiff with vocational rehabilitation. Mr. Henderson has a master's degree in rehabilitation counseling and is a certified rehabilitation counselor. During the time Mr. Henderson was involved in plaintiff's vocational rehabilitation, there were delays and other difficulties in scheduling meetings by plaintiff as well as continuing behavioral and attitude problems. As a result of the problems encountered, Mr. Henderson requested that all meetings be in the presence of plaintiff's attorney.
23. In his testimony at the hearing before the Deputy Commissioner, Mr. Henderson described plaintiff as lacking motivation, having a poor attitude and being generally non-compliant. Mr. Henderson conducted a labor market survey and opined that plaintiff would have found suitable employment within the relevant Jacksonville labor market had he complied with rehabilitation efforts.
24. Jennifer Kines, a hiring assistant for Telemarketing Concepts, first interviewed plaintiff for a sales representative position in August 2002. The position could be for full or part-time employment. A full-time position would be for 40 hours per week earning $8.00 per hour with bonuses. Bonuses averaged $3.00 per hour. The only job skills required for the position were a clear speaking voice and reading ability. There were no physical demands, and to the extent that an employee had physical limitations, accommodations could be made. The company employs about 250 employees.
25. At the hearing before the Deputy Commissioner, Ms. Kines testified that plaintiff told her he was not interested in the job and that he was there because he was told to go there to apply for it. Ms. Kines stated that every question she asked plaintiff was answered with a response opposite to what one would expect to receive from an interested applicant. Plaintiff informed Ms. Kines that he needed lots of breaks and would need special accommodations and Ms. Kines indicated that this would not be a problem. Although Ms. Kines testified that she was not aware of anything that would have prevented plaintiff from being qualified for the job, either physically or educationally, she did not hire him because of reservations about whether plaintiff would come to work and if he would perform his responsibilities in an expected manner.
26. The next time plaintiff applied for work with Telemarketing Concepts in February 2003, plaintiff arrived late for the scheduled interview, and Sandy Hardison, a recruiting manager at the company, told plaintiff that he could not participate since the group interview class had already begun. Plaintiff insisted that someone had to sign his paper. Ms. Hardison tried to reschedule the interview and told him that she would sign the paper at that time. Plaintiff continued to insist that she sign his paper immediately and began shouting that the paper was a "legal document" and that he would "see her in court." Plaintiff had a tape recorder at that meeting and was ultimately asked to leave because he was causing such a disruption. Ms. Hardison informed plaintiff's case manager that she did not want plaintiff to ever return to the facility.
27. Plaintiff's testimony at the hearing directly contradicted the testimony of his vocational rehabilitation counselors. Plaintiff testified that he fully cooperated with all vocational rehabilitation efforts. In direct contradiction of the vocational rehabilitation reports, plaintiff testified that he had filed applications in a timely manner and that all four counselors were attempting to discredit him.
28. The Full Commission assigns greater weight to the testimony of the four vocational counselors regarding plaintiff's history of non-cooperation and non-compliance with vocational rehabilitation efforts than to plaintiff's testimony.
29. The Full Commission finds that plaintiff's chronic non-compliance with vocational rehabilitation efforts to secure employment within his capabilities constitutes an unjustified refusal to cooperate with return to work efforts. Therefore, total disability compensation is suspended while plaintiff refuses to cooperate with vocational rehabilitation efforts.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As plaintiff refused to accept rehabilitation services as ordered by the Industrial Commission on October 1, 2002, he is barred from receiving indemnity benefits during the period of his refusal to cooperate. N.C. Gen. Stat. § 97-25.
2. As a result of plaintiff's compensable injury by accident, the plaintiff is entitled to permanent partial disability compensation as a result of the 10% rating to his back. N.C. Gen. Stat. § 97-31. However, the plaintiff has received compensation since the date of maximum medical improvement in excess of that he would have been entitled to receive for permanent partial disability. Accordingly, the continuing wage-loss compensation paid pursuant to N.C. Gen. Stat. § 97-29 was the more favorable remedy to plaintiff, and he received that benefit "in lieu of" compensation for the permanent disability rating. Therefore, no additional compensation is due plaintiff under N.C. Gen. Stat. § 97-31.Arnold v. Wal-Mart Stores, Inc., 154 N.C. App. 482 (2002).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant may suspend payment of disability compensation to plaintiff as of September 24, 2004, the date of the filing of the Opinion and Award of the Deputy Commissioner.
2. Defendant is entitled to a credit for all disability compensation paid to plaintiff since February 28, 2003, to be deducted from any future award to plaintiff in this matter.
3. No additional compensation is due plaintiff from defendants for permanent partial disability.
4. Each side shall bear its own costs.
This the ___ day of October 2005.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER